# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 25, 2005 Session

## STATE OF TENNESSEE v. WILLIAM DARRYN BUSBY

**Direct Appeal from the Circuit Court for Lewis County**
**No. 6379     Robert E. Lee Davies, Judge**

---

### No. M2004-00925-CCA-R3-CD - Filed March 29, 2005

---

The Defendant, William D. Busby, was convicted by a jury of four counts of rape of a child.  The trial court subsequently sentenced him to four concurrent terms of twenty years in the Department of Correction.  In this direct appeal, the Defendant contends that the trial court committed reversible error by failing to instruct the jury about the State's election of offenses.  Finding that the trial court's error was harmless beyond a reasonable doubt, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Robert D. Massey (at trial), Pulaski, Tennessee and Lloyd R. Tatum (on appeal), Henderson, Tennessee, for the appellant, William Darryn Bubsy.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Jeffrey L. Long, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTS

The victim in this case, C.T.,[1] was ten years old at the time he testified.  He explained that, during the times in question, he was living with his mother, his baby brother, and the Defendant. The Defendant was his mother's boyfriend.

---

[1]It is the policy of this Court to identify the minor victims of sex offenses by their initials.

The victim testified that the first time the Defendant touched him in a "bad" way, he came out of his bedroom in the morning and found the Defendant in the room next door, on the computer. The Defendant showed the victim some pictures of naked women on the computer. The Defendant then asked the victim if he "wanted to know how sex was"; the victim replied, "no." The Defendant pushed the victim into the victim's bedroom, laid him on the bed, pulled the victim's underwear down, and licked the victim's penis. The victim stated that he tried to pull his underwear up, but the Defendant held them down. The Defendant told C.T. that if he told anyone, the Defendant would beat him. The victim testified that his mother was asleep during this incident.

C.T. testified that the Defendant had sexual contact with him a second time, stating "he put my thing in his mouth, I think that's what happened the second time." The victim stated a short time later, "he might've made me put my mouth on his . . . I'm not that sure." The victim said that the Defendant accomplished this by forcing him "with words."

On a third occasion, C.T. and the Defendant were watching a movie together on the couch in the living room. The victim stated, "He told me to put my mouth on his thing and he pushed my head down like that right there." The victim testified that "he made me put my mouth on his thing again until that stuff came out, and then when it came out, I spit it in the floor and then he told me, 'When you get out of the bathroom spitting it in the commode, to clean it up off the floor.'" C.T. said he thought the color of the "stuff" was white.

On another occasion, the victim testified, the Defendant was yelling at someone on the cellphone and the victim woke up. The Defendant then got off the cell phone and again made C.T. put his mouth on the Defendant's penis. The victim thought this incident occurred in the living room.

On a fifth occasion, the victim testified, the Defendant had some clear lotion in a tube with a screw-on top. The Defendant squirted some of this lotion "up" the victim's "bottom" and "put his thing in [the victim's] bottom for about five minutes." This occurred while the victim was bent over his mother's bed with the Defendant standing behind him. After the Defendant put his penis in the victim, the Defendant "moved back and forth." The victim's mother was at work at the time. Afterward, the victim testified, he "had to go clean the lotion of [sic] my bottom and [he] had to use the bathroom."

The victim did not tell anyone about these incidents until after his mother and the Defendant had a big fight. He told his mother then "[b]ecause [he] knew [the Defendant] was gone." The victim had not told his mother before because the Defendant had threatened to beat him.

C.T. stated that he was in the second grade when these incidents occurred.

C.T.'s mother, Ginette Townsend, testified that the Defendant moved in with her and C.T. in April of 2001 while she was pregnant. The Defendant left the residence in July 2002. Ms. Townsend stated that the Defendant was home alone with C.T. on Sundays while she worked. She

told the Defendant to leave after they had a fight and he "slung" her and cussed her in front of C.T. The next day, she testified, C.T. told her what the Defendant had done to him.

Ms. Townsend stated that during a phone call she subsequently had with the Defendant, he admitted to C.T.'s allegations. On a later date, Ms. Townsend again called the Defendant and recorded the phone call. In spite of her efforts, the Defendant did not confess to the alleged crimes during this phone call.

Ms. Townsend acknowledged that C.T. had been assessed by school personnel as being emotionally disturbed. She also explained that C.T. was repeating the second grade when the Defendant's crimes were allegedly committed.

Julie Elizabeth Rosof-Williams testified that she is a nurse practitioner with Our Kids, an outpatient clinic affiliated with Metro General Hospital in Nashville. She examined C.T. following his allegations. During the victim's visit, he stated that his mouth and bottom should be examined for germs. Ms. Rosof-Williams examined C.T.'s genital area, his penis and his "bottom," and determined that they were all "normal." On direct exam, she stated that "[i]t is entirely possible that this child has been anally penetrated, orally penetrated, without any sort of medical evidence, so this exam is consistent with the history of penetration." On cross-examination, she admitted that, "[b]ased on the physical exam findings alone, I cannot tell you whether this child has been sexually abused or not."

After this testimony, the State rested its case. At that point, the trial court excused the jury from the courtroom and then asked the State to make its election of offenses. The prosecuting attorney responded as follows:

Please the Court, on Count 1 of the presentment, the election would be dirty pictures on the computer with [the Defendant] licking [C.T.'s] private parts, his penis area.
. . .
Number two, [C.T.] having [the Defendant's] penis in his mouth by "forcing with words."
. . .
Number three, [C.T.] having [the Defendant's] penis in his mouth and white stuff came out.
. . .
Number four, I would term the cell phone incident, [the Defendant] on the cell phone, and immediately after had [C.T.] put his penis in his mouth.
. . .
Number five, the lotion incident where [the Defendant] put his penis in [C.T.'s] buttock.

Following this itemization, defense counsel made a motion for acquittal on all five counts. After hearing argument, the trial court dismissed Count 2. That count charged, in pertinent part, that the

Defendant "between July, 2001, and February, 2002, . . . unlawfully, intentionally and feloniously did sexually penetrate the victim, a MALE less than thirteen (13) years of age, whose date of birth is 11/11/92, in violation of Tennessee Code Annotated 39-13-522." The language of Count 2 is identical to the language of Count 1. It is also identical to the language of the remaining counts, with the exception that Counts 3, 4 and 5 each reference the time period "between February, 2002, and July, 2002."

Following this jury-out discussion, the jury returned to the courtroom. The trial court did not inform the jury that it had dismissed Count 2 of the indictment. The trial court did not inform the jury about the State's election of offenses. Instead, the Defendant immediately commenced his case. The Defendant testified and steadfastly denied the allegations levied against him by C.T. He also denied having "slung" Ms. Townsend. He denied that he had ever admitted to Ms. Townsend that he molested C.T. During cross-examination, he admitted to having some pornographic photographs on his computer at home.

Following the close of the Defendant's case, the lawyers made their closing arguments to the jury. In pertinent part, the prosecuting attorney told the jury the following:

> We're talking about four separate instances, is what we're talking about, four separate instances that you are to consider in this case. And I've sort of labeled them just so I can distinguish them one from the other and, hopefully, help you a little bit. And the judge, I think, will probably help you with that, also. One of them I call the "dirty pictures on the computer" incident. And if you'll remember on that one, [the Defendant], according to [C.T.], was looking at dirty pictures on the computer and wanted to show him some of them, and then asked him about did he know how to have sex. So that's the one that sets that incident apart from the others.
> And at that time, after they get through with the computer, as [C.T.] said, and corroborated by [the Defendant] and [Ms. Townsend] and some of the rest, they leave the room where the computer is, go one room over to [C.T.'s] bedroom and [the Defendant] licks--at that point pulls his underwear down, won't let [C.T.] lift it back up, he tries to lift it back up and he won't let him, and at that point [C.T.] says that [the Defendant] licked his private part at that point.
> The next incident is the one I'm going to call "stuff came out," and that was pretty graphic in detail. If you'll remember, [C.T.] was talking about that he had [the Defendant's] penis in his mouth and something came out and he spit it, accidentally, part of it on the floor and then later went to the commode and spit the rest out. He had to come back after that, of course, and clean it up out of the floor where [the Defendant] told him to clean it up. He did describe it as white, he did describe the material as white.
> The next incident, what I'm going to call the "cell phone incident." If you'll remember, [C.T.] was talking about [the Defendant] being on the cell phone. And I think the thing that stuck out in my mind, and I don't know, really, whether it had any significance or not, but he said that he was real loud on the telephone talking on

the cell phone, so that stuck out in [C.T.'s] mind that he was louder than normal talking on that cell phone. And shortly after that, he had--[the Defendant] had [C.T.] to put his penis in [C.T.'s] mouth on that incident.

And then the last one is the "lotion incident." If you will remember what [C.T.] said was, is that [the Defendant] took lotion and squirted it in the anal area or either up the anal area or something, and then [the Defendant] got [C.T.] to bend over the bed on his stomach, [the Defendant] was behind him, and he was moving, I believe he said--you probably remember what he did say, I thought he said moving back and forth, is what I thought he said, but you probably remember that better than I do.

And the thing that, I guess, caught me on that one, too, is that [C.T.] said he some way looked around and could see [the Defendant's] part or something behind him, because I think I asked him, "Did it go up in you?" And he said, "Yes," at first, and "it hurt." But he didn't know how far it went up in him because he was able to look around and see part of his part when he looked around behind him.

Again, you've heard what he said about those incidents. Please, look at that and compare them. Look at that and compare them to see what he said at the preliminary hearing, also, rather than me standing here and reading it for you.

The prosecutor did not tell the jury that Count 2 had been dismissed. However, defense counsel stated during his closing argument that "We started out with five cases, now there are only four: Count 1, Count 3, Count 4 and then Count 5. Count 2 is gone . . . ."

Following closing arguments, the transcript of evidence indicates that the trial court "charged the jury as to the law applicable to the case and went over the verdict form . . . ." There is no indication in the record that the trial court informed the jury about the State's election of offenses, or that the court had dismissed Count 2. At the beginning of the jury charge, however, the trial court stated, "The defendant, William D. Busby, is charged in Counts 1, 3, 4 and 5 with the offense of Rape of a Child." Later in the charge, in the section titled "Order of Consideration," the jury was instructed to consider Count 3 after it had concluded its consideration of Count 1. The jury was also provided with four separate verdict forms which refer respectively to Count 1, Count 3, Count 4 and Count 5. The jury was further provided with the indictment, although the record does not indicate whether Count 2 of the indictment was removed prior to its being provided to the jury.

As set forth above, the jury convicted the Defendant of rape of a child on each of the four counts submitted to it.

## ANALYSIS

The Defendant raises only one issue in this appeal. He contends that the trial court committed reversible error by failing to instruct the jury about the State's election of offenses and by failing to provide the jury with an appropriate unanimity instruction. The State disagrees.

The doctrine of election of offenses is implicated when the State charges a defendant with one or more sexual offenses and then adduces at trial proof of more sexual offenses than have been charged. Under those circumstances our supreme court has long and consistently held that the State must select from among the various offenses proved, those particular acts upon which it seeks convictions. See State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001); State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); Tidwell v. State, 922 S.W.2d 497, 500-01 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134, 136-37 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). The Burlison decision cites three reasons for the election requirement:

> First, to enable the defendant to prepare for and make his defense to the specific charge; second, to protect him from double jeopardy by individualization of the issue, and third, so that the jury's verdict may not be a matter of choice between offenses, some jurors convicting on one offense and others, another.

501 S.W.2d at 803. It is the third of these reasons that addresses the most serious concern: "the well-established right under our state constitution to a unanimous jury verdict before a criminal conviction is imposed." Shelton, 851 S.W.2d at 137. This right "requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." Id. (emphasis added).

Our supreme court has "stressed that the election requirement is a responsibility of the trial court and the prosecution and, therefore, does not depend on a specific request by the defendant." Kendrick, 38 S.W.3d at 569. More emphatically, our high court in Burlison held that

> it [is] the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense of carnal knowledge upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense.

501 S.W.2d at 804. The defendant's right to a unanimous jury verdict on each and every count is "fundamental, immediately touching the constitutional rights of an accused." Id. As such, any error committed by the trial court in failing to require the State to elect the offenses on which it chooses to seek conviction, or to properly instruct the jury thereon, is reversible unless determined to be harmless beyond a reasonable doubt. See Shelton at 138.

In the instant case, the State charged the Defendant with five counts of rape of a child. The victim testified on direct examination about five distinct occurrences which, taken as true, constituted five commissions of rape of a child. See Tenn. Code Ann. § 39-13-522(a). The victim testified that the Defendant (1) licked the victim's penis; (2) forced the victim "with words" to perform fellatio; (3) had the victim perform fellatio while they were watching a movie, during which act the Defendant ejaculated; (4) required the victim to perform fellatio after a cellphone conversation; and (5) sexually penetrated the victim's anal area. Initially, then, the State did not

introduce proof of more sexual offenses than were charged. However, following the close of the State's proof, the trial court dismissed Count 2. Thus, the jury had five specific events from which to choose in determining whether to convict the Defendant of four counts. This is the very evil which an election of offenses is designed to avoid.

Although the State did, in fact, elect its offenses at the close of its proof, it did so outside the presence of the jury. Moreover, the trial court never informed the jury of the State's election. Nor did the trial court ever inform the jury that it had dismissed Count 2. The very crux of the election requirement is to ensure jury unanimity. The trial court committed error when it failed to instruct the jury about the State's election of offenses and its own dismissal of Count 2 of the indictment.

Nevertheless, this Court has previously determined that a trial court's failure to properly instruct the jury about the State's election may be harmless where the prosecutor provides during closing argument an effective substitute for the missing instruction. See, e.g., State v. James Arthur Kimbrell, No. M2000-02925-CCA-R3-CD, 2003 WL 1877094, at *23 (Tenn. Crim. App., Nashville, April 15, 2003); State v. Michael J. McCann, No. M2000-2990-CCA-R3-CD, 2001 WL 1246383, at *5 (Tenn. Crim. App., Nashville, Oct. 17, 2001); State v. William Dearry, No. 03C01-9612-CC-00462, 1998 WL 47946, at *13 (Tenn. Crim. App., Knoxville, Feb. 6, 1998). We have concluded that the prosecutor provided such an effective substitute during his closing argument in this case. As set forth above, he identified very specifically the four distinct occurrences alleged by the victim on which the State was seeking convictions. The jury was given only four counts on which to deliberate the Defendant's guilt or innocence. Defense counsel informed the jury during his closing argument that Count 2 had been dismissed. These aspects of the case obviated the danger of a "patchwork" verdict. Therefore, under all of these circumstances, we are convinced beyond a reasonable doubt that the jury convicted the Defendant of four counts of rape of a child based on the evidence of the four occurrences specified by the State during closing argument.

The Defendant points out that the jury had before it evidence of additional sexual offenses. During his cross-examination of C.T., defense counsel questioned the victim about his preliminary hearing testimony. Defense counsel was using this prior testimony for impeachment purposes. At the close of the victim's testimony, defense counsel introduced a transcript of the victim's preliminary hearing testimony as an exhibit, and it was admitted into evidence without objection. Both the prosecutor and defense counsel referred to this document during their closing arguments. The exhibit was available to the jury during its deliberations.

During his preliminary hearing testimony, the victim testified with specificity about four incidents of molestation: testimony which the victim essentially repeated during trial. At the end of the State's questioning during the preliminary hearing, the victim also testified that the Defendant "did them stuff a few more times." On prompting, the victim stated this "stuff" was the Defendant putting the victim's "privates" in the Defendant's mouth. The victim stated this happened "maybe four" times. The victim did not repeat these vague allegations during trial.

We recognize that the jury may have read this exhibit during its deliberations and may therefore have discovered this proof of uncharged offenses. However, the testimony was vague, brief and very general. This Court has previously recognized that, where a child witness testifies to one instance of sexual contact with particularity, but also makes minor references to other instances, the minor references are harmless in the context of the election requirement. See State v. Darrell Dodson, M1998-00067-CCA-R3-CD, 2000 WL 378347, at *7 (Tenn. Crim. App., Nashville, April 14, 2000). We conclude that the victim's minor references to other, uncharged acts during his preliminary hearing testimony were likewise harmless under the circumstances of this case.

The Defendant also complains that the trial court erred in failing to provide the jury an enhanced unanimity instruction. The Defendant correctly points out that the trial court merely instructed the jury that, "In order to return a verdict it is necessary that each juror agree thereto. Your verdict must be unanimous." However, our supreme court has opined that, where an effective election of offenses has been made, an enhanced jury instruction on unanimity is not necessary. See Johnson, 53 S.W.2d at 635. This issue is therefore without merit.

In sum, the trial court erred in failing to instruct the jury about the State's election of offenses. We have determined, however, that the error was harmless beyond a reasonable doubt. Accordingly, the Defendant is not entitled to relief on this issue.

We affirm the judgments of the trial court.


_____

DAVID H. WELLES, JUDGE